246 P.3d 358

**FIRST INSURANCE COMPANY OF HAWAII, LTD., Plaintiff–Appellant,**

v.

**Angel DAYOAN, Sr., Defendant–Appellee.**

No. 28301.

Intermediate Court of Appeals of Hawai'i.

Nov. 18, 2010.

As Corrected Dec. 8, 2010.

NAKAMURA, C.J., FUJISE and REIFURTH, JJ.

Opinion of the Court by REIFURTH, J.

Plaintiff–Appellant First Insurance Co. of Hawaii, Ltd. (First) appeals from the November 1, 2006 Final Judgment of the Circuit Court of the Third Circuit (Circuit Court).[1] Broadly stated, the issues on appeal are whether Defendant–Appellee Angel Dayoan, Sr. (Dayoan) remains entitled to wage loss benefits under a motor vehicle insurance policy issued by First, whether Dayoan was entitled to an award of attorneys' fees and costs, and, if so, whether the amount of attorneys' fees awarded was appropriate.

As points of error, First contends that the Circuit Court erred in granting summary judgment in favor of Dayoan, because the judgment (1) leads to an absurd and unjust result that is inconsistent with the purpose of Hawai'i's no-fault law, (2) fails to give effect to the Hawai'i Legislature's (Legislature) intention concerning Hawai'i's no-fault law as subsequently amended, (3) does not incorporate into Dayoan's personal auto policy the language of the no-fault law as subsequently amended, and (4) does not apply retroactively the language of the no-fault law as subsequently amended. In addition, First contends that the Circuit Court erred in awarding attorneys' fees to Dayoan, and awarding those fees at $250 per hour, despite (5) First's complaint being limited to declaratory relief, (6) First having paid monthly wage loss benefits to Dayoan throughout, and (7) the Hawai'i Insurance Commissioner's (Commissioner) limitation of attorneys' fees to $125 per hour.

We affirm.

I. BACKGROUND

A. Factual Background

On March 26, 1998, Dayoan was injured in a motor vehicle accident on Highway 19 on the Island of Hawai'i (Accident). At the time of the Accident, Dayoan was sixty years old and was covered by a Personal Auto Policy issued in February 1998 by First to Magdalena S. Dayoan, Dayoan's wife (Policy).

Randall Y.S. Chung and James H. Monma (Matsui Chung), on the briefs, for Plaintiff–Appellant.

Dwayne Stephen Lerma and Jo Anne E. Goya (Lerma & Goya), on the briefs, for Defendant–Appellee.

1. The Honorable Glenn S. Hara presided.

The Accident left Dayoan disabled and unable to engage in his usual occupation. At the time, Dayoan worked as a kitchen helper/dishwasher at Jimmy's Drive Inn in Hilo, Hawai'i, and grew produce for additional income. The extent of Dayoan's disability and the reasonableness of the physician certification that he remains disabled are not issues on appeal.[2]

After the Accident, Dayoan applied for benefits as an eligible injured person under the Policy. First extended coverage to Dayoan and, in a Disclosure of Benefits letter dated April 3, 1998, explained that the Policy included optional wage loss benefits that would terminate upon Dayoan's death. From 1998, Dayoan requested payment of wage loss benefits under the Policy and First paid a monthly wage loss benefit of $1,500 to Dayoan pursuant to terms of the Policy.

### B. The Policy

Section II.A. of the Policy's Optional Benefits Coverage Schedule provides coverage for wage loss of any "insured" under the Policy who, as a consequence of an "auto accident," suffers "bodily injury" which prevents the insured from engaging in the employment in which the insured was engaged immediately prior to the accident:

INSURING AGREEMENT

For those coverages indicated as applicable in the Schedule or in the Declarations, we will pay Optional Benefits to or for an "insured" who sustains "bodily injury" resulting from an "auto accident." Optional Benefits Coverage consists of the coverages described below....

1. Wage Loss. Monthly earnings loss, consisting of lost net income after taxes, for injuries which prevent an "insured" from engaging in the employment in which the "insured" was engaged in immediately prior to the "auto accident."

a. Wage loss shall be paid:

(1) For up to two years following the date of the accident as long as the treating health care provider determines the "insured's" injuries prevent the "insured" from engaging in the employment he or she was engaged in immediately prior to the accident.

(2) After two years following the date of the accident only if the treating health care provider determines the "insured" is disabled from employment to which the "insured" is suited by education, training and experience.

. . . .

b. Wage loss, including loss of expected income, shall terminate upon the death of the "insured."

### C. Hawai'i Insurance Code

■ Hawai'i's insurance laws are set out in chapter 431, Hawaii Revised Statutes (HRS) (2005 and Supp.2009) (Insurance Code). "The statutory law in force and effect at the time of the issuance of a policy becomes a part of the contract as though expressly written therein and a policy must be considered to contain those requirements." *Bowers v. Alamo Rent–A–Car, Inc.,* 88 Hawai'i 274, 281, 965 P.2d 1274, 1281 (1998) (quoting Eric Mills Holmes, *Holmes's Appleman on Insurance* § 9.1, at 477 (2d ed.1996)).

HRS § 431:10C–302 (Supp.1997) (Section 302) addresses an insurer's obligation to make available various optional insurance coverages. Coverages are optional because insureds may choose to pay for and receive them, or not. Mandatory coverages, on the other hand, are provided for in HRS § 431:10C–301 (Supp.1997) (Section 301). Coverages are mandatory in that they are required by law to be a part of the no-fault base benefits package, and are received and paid for whether the policyholder wants them or not.

---

**2.** First does not raise as a point of error the Circuit Court's conclusion that First's obligation to Dayoan "s hall terminate upon the death of Plaintiff," except insofar as First contends that this illustrates the "absurdity" of the aforementioned errors. "Points not presented in accordance with this section will be disregarded[.]" Haw. R.App. P. 28(a)(4)(D) (2006). "Points not argued may be deemed waived." Haw. R.App. P. 28(a)(7) (2006).

The Hawai'i motor vehicle insurance law was substantially modified in the 1997 legislative session in Act 251, with amendments made effective January 1, 1998 (Act 251).[3] The purpose of Act 251 was "to provide much demanded and much needed amendments to the motor vehicle insurance law to reduce motor vehicle insurance premiums and to preserve adequate protection of the rights of drivers." 1997 Haw. Sess. Laws Act 251, § 1 at 514.

One of the legislative sponsors explained how the proposal would produce savings by allowing consumers to select or opt out from expensive optional coverages:

> We've made many of the costly mandatory coverages required under our current law optional. This is pro consumer and it produces savings. It now puts the consumer in the driver's seat to select the kind of automobile coverage the consumer needs. It's not mandated by the state that we carry all of these coverages if in fact we do not need them. *Wage loss, death benefits, alternative care providers are examples of coverage that is now optional.*

1997 Haw. Senate Journal, at 798 (comments of Senator Baker) (emphasis added).[4] Others noted, though, that insured purchasing optional coverages might end up paying more.[5]

In sum, the 1997 Legislature addressed motor vehicle insurance system costs by: "(1) reducing the tort threshold; (2) convert-

---

3. The amendments to Section 301 and Section 302 contained in Act 251 are referred to as the "1997 Amendments."

4. Senator Baker referred to the fact that "our actuary, Mr. Simons, has given us his stamp of approval on the bill ... and he is confident [this bill] will, in fact, produce savings of between 20 and 35 percent." 1997 Haw. Senate Journal, at 797 (comments of Senator Baker). Senator Baker then introduced Mr. Simons's May 1, 1997 memorandum to Insurance Commissioner Rey Graulty into the Senate Journal. Mr. Simons explained that insureds who did not wish or need to purchase wage loss coverage would benefit from making the coverage optional:

> (4) Under the current system, insurance purchasers are required to purchase coverage for wage losses regardless of whether they are wage earners or not and regardless of whether they have wage loss coverage elsewhere or not. This includes retired people as well as those with wage loss coverage through a program provided by their employer. HB100 CD1 provides the opportunity for people to save money by not having to purchase coverage for funds they will never collect or for losses that are covered elsewhere. These are real savings provided for automobile insurance policyholders whether they purchase minimum limits or higher limits of coverage.

1997 Haw. Senate Journal, at 812 (Attachment "II").

Others emphasized that there was risk involved in making optional the former mandatory coverages. In the House of Representatives, for instance, Representative Colleen Meyer expressed concerns:

> The savings this bill provides are due to a reduction in the mandated minimum coverage. As my colleague from Puna stated earlier, anyone would expect to pay less for half as much of a product that they are purchasing.

I am concerned about the wage loss coverage not being included. There are many people that have been paying for insurance for twenty years was included [sic] and there is truly a potential that they will not ask for that optional coverage, not realizing that it's not included and could find themselves in a very bad bind if they are involved in a serious accident.

1997 Haw. House Journal, at 1003 (comments of Representative Meyer).

5. During the floor vote (final reading) on the conference draft of the bill, Senator Randy Iwase spoke against the bill, by quoting from a letter from an insurance company that was addressed to the senate, then noting that if an insured already purchased and wanted to continue the newly optional coverages, his or her premium would likely increase:

> "[A]lthough there are some cost-saving features in this bill, most of the savings are due to a reduction ... in mandated minimum coverage. This means individuals who carry higher limits and desire the same amount of coverage as they have today will see little savings ... under the new system. In fact, some could even see price increases."
> ....
> ... [I]f you are among the vast middle class ... struggling to make ends meet, this bill will *not* help you. You will *not* see a 20 percent reduction—let's be honest about that! You may even see an *increase*—let's be honest about that! ... You need wage loss coverage. This bill will not bring a reduction in premium. It may even bring a premium increase if you purchase back—just purchase back—what you've got today. Wage loss—who's going to tell the consumer in your district don't purchase wage loss coverage.

1997 Haw. Senate Journal, at 799–800 (comments of Senator Iwase). Other Senators made similar remarks. *Id.* at 801–02.

ing costly mandatory coverages for wage loss, death benefits, and alternative care benefits to optional coverages; and (3) reducing recoveries for bodily injury damages by a covered loss deductible." *State Farm Mut. Auto. Ins. Co. v. Gepaya*, 103 Hawai'i 142, 148, 80 P.3d 321, 327 (2003).[6]

The following year, the 1998 Legislature made further amendments to Section 302 as part of Act 275 (Act 275).[7] The purpose of Act 275 was explained as follows:

> SECTION 1. The purpose of this Act is to continue to effectuate motor vehicle insurance reform initiated by the passage of Act 251, Session Laws of Hawaii 1997. This Act:
>
> (1) Assists Hawaii drivers and insurers during the transitional phase of the implementation of new laws;
>
> (2) Streamlines the motor vehicle insurance administration process; and
>
> (3) Makes numerous technical, nonsubstantive changes for purposes of clarity and style.

1998 Haw. Sess. Laws Act 275, § 1 at 922.

The 1998 Amendments relating to the wage loss benefit option reduced the minimum benefit, narrowed the range of wage loss benefit levels that needed to be made available, permitted wage loss caps per accident, and set a floor below which the total wage loss benefit package for each benefit option could not fall. HAW.REV.STAT. § 431:10C–302(a)(4); 1998 Haw. Sess. Laws Act 275, § 18 at 929–30. In addition, the 1998 Amendments continued to permit insurers to offer higher wage loss coverage limits, but removed the treating physician certification of eligibility from the process. *Id.*

### D. Proceedings

On April 21, 2005, after paying wage loss benefits to Dayoan for almost seven years, First filed a Complaint For Declaratory Judgment requesting that the Circuit Court declare that First was no longer obligated to extend wage loss benefits to Dayoan.

First argued that it was entitled to summary judgment because the 1998 Legislature capped the amount of wage loss benefits to which policyholders were entitled. First argued that this amendment, although enacted subsequent to the Accident, should be read to (i) clarify the Legislature's intent in adopting the 1997 Amendments to Section 302, (ii) clarify the terms of Dayoan's Policy, and (iii) thereby limit the insurer's wage loss liability to $9,000 per accident. According to First, Dayoan, at 68 years of age, was "no longer suited for employment." Consequently, First argued, Dayoan's reading of the Policy "would lead to the illogical and inconceivable result of forcing an insurer to continue to pay wage loss benefits to an insured who is no longer suited for employment and would not have, in reality, incurred any loss of wages."

Dayoan countered that he was entitled to summary judgment because he was entitled to receive wage loss benefits under the terms of the Policy.

The Circuit Court denied First's and granted Dayoan's motion for summary judgment, concluding that the Policy and the 1997 Amendments on which it was based were clear:

> It appears to the court that, as I indicated, the language in the policy is clear, especially when you look at subsequent attempts at limiting that liability. Now, I don't think that interpreting the policy and, generally, the statute in the same way, because of the clear statutory language, results in any absurdity. And the reason I say that is because there are ample examples where the actuarial risks undertaken by the insurer includes ... measuring exposure by a—a person's life—life insurance annuities and so forth. And to the court ... the risk inherent in terms of what was in the policy is apparent.

---

6. Before wage loss became an option under the 1997 Amendments, it was included as part of the base no-fault motor vehicle insurance coverage. HAW.REV.STAT. § 431:10C–301 (1993); HAW. REV STAT. § 431:10C–304 (1993); HAW.REV.STAT. § 431:10C–103(10) (1993).

7. The 1998 Legislature's amendments to Section 302 contained in Act 275 are referred to as the "1998 Amendments."

If the insurance company is now saying, well, we didn't take it into account, and I think that's their problem, it's not an interpretation of, you know, it's not a probable interpretation what they provided in the policy or what was clear in the statute. And although I'm not resting my ruling entirely on it, it looks like the subsequent statutory change, to include the twelve thousand dollar limit, would seem to indicate to me that was, at least, some indication that something—that there was ... a desire to change what was ... a cap ... of the benefit at the end of a person's lifetime to a dollar amount.

### E. Attorneys' fees and costs

Following the Circuit Court's award of summary judgment, Dayoan filed a motion under HRS § 431:10–242 (2005) (Section 242)[8] seeking $10,885.35 in attorneys' fees and excise tax and $695.99 for costs. First countered that fees and costs were not available under the Insurance Code and, if they were, the fees were excessive at an hourly rate of $250.

The Circuit Court awarded Dayoan attorneys' fees in the amount of $10,450.00, at a rate of $250 per hour, and costs in the amount of $695.00, ruling that the time spent and hourly rate of counsel was reasonable. Dayoan's request for $435.35 in general excise tax costs was denied.

## II. STANDARDS OF REVIEW

### Motion For Summary Judgment

We review the Circuit Court's grant or denial of summary judgment *de novo. Price v. AIG Hawai'i Ins. Co.,* 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law.'" *Gillan v. Gov't Employees Ins. Co.,* 119 Hawai'i 109, 114, 194 P.3d 1071, 1076 (2008) (quoting Haw. R. Civ. P. 56(c)).

> A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.
>
> ... The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Hawaii Cmty. Fed. Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) (citations and internal quotation marks omitted) (quoting *Dairy Road Partners v. Island Ins. Co.,* 92 Hawai'i 398, 411, 992 P.2d 93, 106 (2000)).

### Statutory Interpretation

We review the circuit court's interpretation of a statute *de novo.* Our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*State Farm Mutual Auto. Ins. Co. v. Gepaya,* 103 Hawai'i 142, 145, 80 P.3d 321, 324 (citation omitted) (quoting *Troyer v. Adams,* 102 Hawai'i 399, 409, 77 P.3d 83, 93 (2003)). "Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." *Liberty Mut. Fire Ins. Co. v. Dennison,* 108 Hawai'i 380, 384, 120 P.3d 1115, 1119 (2005) (internal quotation marks omitted) (quoting *Labrador v. Liberty Mut. Grp.,* 103 Hawai'i 206, 211, 81 P.3d 386, 391 (2003)).

---

**8.** The Insurance Code provides for attorneys' fees and costs as follows:

> Where an insurer has contested its liability under a policy and is ordered by the courts to pay benefits under the policy, the policyholder, the beneficiary under a policy, or the person who has acquired the rights of the policyholder or beneficiary under the policy shall be awarded reasonable attorney's fees and the costs of suit, in addition to the benefits under the policy.

Haw.Rev.Stat. § 431:10–242 (2005).

**Attorneys' Fees**

[The appellate] court reviews the denial and granting of attorney's fees under the abuse of discretion standard. The same standard applies to [the appellate] court's review of the amount of a trial court's award of attorney's fees. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Chun v. Bd. of Trs. of the Emps' Ret. Sys. of the State of Hawai'i*, 106 Hawai'i 416, 431, 106 P.3d 339, 354 (2005) (internal quotation marks, citations, brackets in original, and ellipses omitted) (quoting *Chun v. Bd. of Trs. of the Emps' Ret. Sys. of the State of Hawai'i*, 92 Hawai'i 432, 439, 992 P.2d 127, 134 (2000)).

## III. DISCUSSION

### A. The Circuit Court Properly Granted Dayoan's Motion For Summary Judgment

■ Dayoan is an "insured" under the Policy, who, as a consequence of the Accident suffered "bodily injury" which prevented him from engaging in the employment in which he was engaged immediately prior to the Accident. Dayoan's Policy included optional wage loss coverage, and, under this provision, Dayoan is entitled to $1,500 per month for as long as his treating health care provider determines that he is disabled from the employment to which he is suited by education, training, and experience. First does not contest Dayoan's entitlement to wage loss benefits under the Policy. In fact, First explicitly informed Dayoan that "wage loss shall terminate upon [his] death."

Absent an exception of the sort urged by First below, the Policy is governed by the law in effect at the time of its issuance. As to wage loss benefits under the Policy, we would therefore be required to apply the 1997 Amendments "as though expressly written therein." *Bowers*, 88 Hawai'i at 281, 965 P.2d at 1281. Under the plain language of the 1997 Amendments and the Policy, the terms of which are consistent with the amendments, Dayoan is entitled to wage loss

benefits of $1,500 per month. According to the unchallenged conclusion of the Circuit Court, that benefit "shall terminate upon [Dayoan's] death." *See, supra* at 2, n. 2.

First takes no issue with the Circuit Court's conclusion that the plain language of the Policy and the 1997 Amendments incorporate no per accident cap on wage loss benefits. Rather, First urges a limitation on Dayoan's entitlement founded instead upon its contention that an uncapped wage loss benefit is illogical, inconceivable, absurd or unjust, and that the Legislature's adoption of the 1998 Amendments discloses a legislative intent to have adopted, in 1997, a cap on overall wage loss benefits. For the reasons discussed below, we conclude to the contrary.

1. The Circuit Court's order granting Dayoan's motion for summary judgment did not lead to an absurd or unjust result and was not inconsistent with the purpose of the Hawai'i no-fault law.

First asserts that the Circuit Court erred in granting Dayoan's motion for summary judgment because it "leads to an absurd and unjust result that is inconsistent with the purpose of the Hawai'i no-fault law, which is to reduce and stabilize the cost of vehicle insurance." Specifically, First argues that the Circuit Court's interpretation of Section 302 leads "to an illogical and absurd result by compelling the motor vehicle insurance carrier to pay wage loss benefits for years, perhaps decades, following a single motor vehicle accident." First contends that Dayoan is no longer suited for employment because of his age and that, except for the Accident, he would likely not be working any longer. As a result, First claims that the Circuit Court's application of the 1997 Amendments leads to the "illogical and inconceivable" result of forcing an insurer to pay wage loss benefits to an insured who is no longer suited for employment.

■ When the law is unambiguous, "our sole duty is to give effect to its plain and obvious meaning." *State v. Kalama*, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (internal quotation marks omitted) (quoting *Citizens for Protection of North Kohala Coastline v.*

*County of Hawai'i,* 91 Hawai'i 94, 107, 979 P.2d 1120, 1133 (1999)). "Departure from the literal construction of a statute is justified only if such a construction yields an absurd and unjust result obviously inconsistent with the purposes and policies of the statute." *Leslie v. Bd. of Appeals,* 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006) (internal quotation marks omitted) (quoting *Shin v. McLaughlin,* 89 Hawai'i 1, 4, 967 P.2d 1059, 1062 (1998)).

In addition, the Circuit Court's interpretation of Section 302 is not inconsistent with the Legislature's goal of reducing and stabilizing the cost of vehicle insurance. The 1997 Amendments to Section 302 were part of a "full scale change [ ] to fix the [motor vehicle insurance] system" designed to "yield a significant reduction in premiums, control litigation, and provide adequate medical coverage without a cost shift to businesses and employees." Stand. Comm. Rep. No. 932, in 1997 Haw. Senate Journal, at 1255.

There were multiple amendments in 1997 to the wage loss benefit provisions, and wage loss benefit amendments were only a small fraction of the total no-fault amendments included as part of Act 251.[9] Nothing requires that each of the Act 251 components achieve cost reductions for all insureds in all circumstances in order to meet the law's objectives.

A significant feature of the 1997 Amendments was that savings would be achieved by making wage loss an optional coverage that insureds were no longer required to purchase.[10] Others noted that premiums might increase for those who purchased optional coverages.[11] Therefore, an increase in premiums for those who purchased the wage loss benefit was neither unforeseen nor inconsistent with the Legislature's stated intent in adopting Act 251.[12]

2. The Circuit Court did not err by failing to give effect to the Legislature's intention as reflected in the 1998 Amendments to Section 302 in granting Dayoan's motion for summary judgment.

The chronology of events is important in evaluating the Legislature's intent. Act 251 and, in particular, the 1997 Amendments had an effective date of January 1, 1998. Dayoan's Policy was issued in February 1998, the Accident occurred on March 26, 1998, and his notice of claim was filed with First on or before April 3, 1998. The 1998 Amendments became effective on July 20, 1998.

■ First contends that the Policy should be interpreted consistently with the 1998 Amendments because those amendments "clarify the intent of Act 251." (quoting Conf. Comm. Rep. No. 117, in 1998 Haw. House Journal, at 1000). Although we look to subsequent legislative history to confirm our interpretation of earlier statutory provisions, *Macabio v. TIG Ins. Co.,* 87 Hawai'i 307, 317, 955 P.2d 100, 110 (1998), we weigh such arguments with "extreme care." *Hawaii Providers Network, Inc. v. AIG Hawaii Ins. Co.,* 105 Hawai'i 362, 370 n. 19, 98 P.3d 233, 241 n. 19 (2004) (internal quotation marks omitted) (quoting *Andrus v. Shell Oil Co.,* 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980)).

While we do not reject out of hand subsequent legislative action as a basis for interpreting a previously adopted statute, a 1998 Conference Commit tee Report is a slender reed upon which to determine the 1997 Legislature's intent. What is evident is that there were multiple purposes behind the multiple amendments that were, collectively, Act 251.

---

9. Act 251 consisted of seventy sections, fifty-nine of which amended different sections of the Insurance Code. Of those, only three sections (sections 13, 38 and 41) address the wage loss (or monthly earnings loss) benefit. 1997 Haw. Sess. Laws Act 251, *passim.*

10. *Supra* at 4–5, n. 4.

11. *Supra* at 5–6, n. 5.

12. As to the issue of Dayoan's age-related employability, we note, without deciding, that nothing in the 1997 Amendments appears to prohibit a certifying physician from considering whether the presenting patient is otherwise unemployable irrespective of accident-related injuries. Furthermore, First provides no evidence that it would have refused premiums from any insured who was past the "retirement age" of 65. In sum, the result here is not illogical, inconceivable, absurd or unjust.

434

One of the fundamental rules for interpreting an insurance policy is that "the statute in effect as of the policy's effective date, governs the policy at issue and is part of the contract with full binding effect upon each party." *Allstate Ins. Co. v. Kaneshiro*, 93 Hawai'i 210, 214, 998 P.2d 490, 494 (2000). The Circuit Court's reading of Section 302 is not inconsistent with the Legislature's intent in adopting Act 251. Consequently, we reject First's invitation to depart from the law in effect at the time of the Policy's effective date.

The fact that the 1997 Amendments did not include an upper limit to wage loss benefits does not establish First's claim that there was a "defect" or an "oversight" in the law, since the 1998 Amendments did not mandate an upper limit either.[13] The 1998 Amendments stated a nominal per accident benefits cap, but explicitly retained the ability for insurers to "mak[e] available higher limits of coverage." As a result, there is nothing upon which we can conclude that First would have capped wage loss benefits in February 1998 (when Dayoan's Policy was issued) even if the 1998 Amendments were interpreted as being applicable to the Policy.[14]

In sum, reducing the benefits that insureds were required to purchase was expected to result in a less expensive base vehicle insurance policy. Focusing on a single optional benefit as applied to a single covered insured cannot establish that the 1998 Amendments to Section 302 better reflected the 1997 Legislature's intent in adopting Act 251. The Policy provided that wage loss benefits "s hall terminate upon the death of the 'insured'," and that provision was not inconsistent with or barred by the 1997 Amendments. The failure of the 1997 Amendments to preclude an uncapped wage loss benefit is not absurd and we cannot rewrite the statute

under the guise of clarification. The fact that the Legislature amended the statute in 1998 to permit wage loss benefit caps is not sufficient to establish that it meant to require them in 1997. Absent a more definite statement by the Legislature, we cannot allow a subsequent amendment to govern interpretation of a prior statute.

3. The Circuit Court did not err by not incorporating into Dayoan's Policy, or retroactively applying, the 1998 Amendments to Section 302.

Finally, First raises two related arguments, contending that the Circuit Court erred by not retroactively incorporating into the Policy, or retroactively applying, the 1998 Amendments to Section 302.

As noted above, "[t]he statutory law in force and effect at the time of the issuance of a policy becomes a part of the contract as though expressly written therein and a policy must be considered to contain those requirements." *Bowers*, 88 Hawai'i at 281, 965 P.2d at 1281 (quoting *Holmes's Appleman on Insurance* § 9.1, at 477). First argues, however, that the 1998 Amendments, and not the 1997 Amendments, should be incorporated into or used to interpret the Policy.

First makes two arguments in support: (1) when an insurance policy is in conflict with applicable law, the law must take precedence, citing *Sol v. AIG Hawai'i Ins. Co.*, 76 Hawai'i 304, 307, 875 P.2d 921, 924 (1994); and (2) laws that are subsequently amended for remedial or clarification reasons are applied retroactively, citing *Tam v. Kaiser Permanente*, 94 Hawai'i 487, 495–96, 17 P.3d 219, 227–28 (2001).

Neither case, however, supports First's argument. *Sol* involved a contractual provision that was prohibited by existing law. Finding

**13.** First's contention that the 1998 Amendments established a wage loss benefits cap is inconsistent with our previous observation that the 1998 Amendments "establish[ed] an effective *minimum* amount of coverage[.]" *Dai–Tokyo Royal State Ins. Co. v. Yokote*, 103 Hawai'i 181, 188, 80 P.3d 1002, 1009 (App.2003) (emphasis added). *See also Mizoguchi v. State Farm Mut. Auto. Ins. Co.*, 66 Haw. 373, 377–378, 663 P.2d 1071, 1074 (1983) ("It is apparent therefore that the statutory provisions regarding basic no-fault benefits set

minimum limits, which the parties are allowed to exceed.").

**14.** It does further damage to First's argument that, despite the Legislature's adoption of the 1998 Amendments to Section 302, First subsequently offered uncapped wage loss coverage to Dayoan for the period August 4, 1998—February 4, 1999 at the same price that it was offered in the prior period.

that "[t]he terms of the contract contravene the statutory language intended to prevent, off-sets of no-fault benefits from uninsured motorist benefits[,]" the court held that the law prevailed. *Sol,* 76 Hawai'i at 307, 875 P.2d at 924.

In the instant case, the terms of the Policy incorporated the 1997 Amendments and, even after Act 275 was adopted, were not prohibited by the 1998 Amendments. The Policy's wage loss benefit levels, for instance, were not prohibited by Act 275, which explicitly continued to provide that "nothing shall prevent an insurer from making available higher limits of coverage." HAW.REV.STAT. § 431:10C–302(a)(4) (2005); 1998 Haw. Sess. Laws Act 275, § 18 at 930.

First contends that *Tam* closes the logical loop and requires that the 1998 Amendments apply retroactively. *Tam,* however, holds that under "established rule[s] of construction, a statute providing remedies or procedures that *do not affect existing rights,* but merely alter the means of enforcing or giving effect to such rights, may apply to pending claims-even those arising before the effective date of the statute." *Tam,* 94 Hawai'i at 495, 17 P.3d at 227 (emphasis added). Since Dayoan had an "existing right" to wage loss benefits as of the Accident, the 1998 Amendments would not relate back under *Tam.*

The 1997 Amendments required, and the 1998 Amendments carried forward the requirement, that "[a]ny change in the wage loss benefits coverage selected by an insured shall apply only to benefits arising out of motor vehicle accidents occurring after the date the change becomes effective." *Compare* 1997 Haw. Sess. Laws Act 251, § 39 at 536 *with* 1998 Haw. Sess. Laws Act 275, § 18 at 930. Although applying to choices made by the insured, this provision suggests that the Legislature wanted the wage loss benefit coverage in effect when an accident occurred to apply.

█ In Hawai'i, "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended." HAW.REV. STAT. § 1–3 (2009). The provision "is only a rule of statutory construction and where the legislative intent may be ascertained, it is no longer determinative." *State v. Nguyen,* 81 Hawai'i 279, 290, 916 P.2d 689, 700 (1996) (internal quotation marks omitted) (quoting *State v. Von Geldern,* 64 Haw. 210, 213, 638 P.2d 319, 322 (1981)). We find no contrary legislative intent in the instant case, and find no error in the Circuit Court's failure to incorporate into Dayoan's Policy, or to retroactively apply, the 1998 Amendments to Section 302.

**B. The Circuit Court Did Not Abuse Its Discretion In Awarding Dayoan Attorneys' Fees and Costs**

First raises three points of error with regard to the Circuit Court's award of attorneys' fees and costs: (1) that fees and costs were not warranted because First sought declaratory relief; (2) that fees and costs were not warranted because First continued to pay wage loss benefits to Dayoan; and (3) that the amount of the fees awarded was excessive because the Commissioner had previously determined that $125 was a reasonable hourly rate for purposes of attorneys' fees recovery.

█ The fact that First sought declaratory relief from the Circuit Court and continued to pay wage loss benefits to Dayoan throughout the period of the challenge has no bearing on Dayoan's entitlement to attorneys' fees and costs under Section 242, which provides that:

Where an insurer has contested its liability under a policy and is ordered by the courts to pay benefits under the policy, the policyholder, the beneficiary under a policy, or the person who has acquired the rights of the policyholder or beneficiary under the policy shall be awarded reasonable attorney's fees and the costs of suit, in addition to the benefits under the policy.

HAW.REV.STAT. § 431:10–242.

By requesting that the Circuit Court declare that it was no longer responsible for paying Dayoan's wage loss benefits, First disputed its liability under the Policy. When the Circuit Court declared that First "has an obligation to pay wage loss benefits to [Dayoan] ... in the amount of $1,500 per month[,]" Dayoan's rights under Section 242 were implicated.

First cites to *Mikelson v. United Serv. Auto. Ass'n,* 108 Hawai'i 358, 120 P.3d 257 (2005), in support of its contention that Section 242 is inapplicable in the circumstances of this case. To the contrary, however, *Mikelson* demonstrates why attorneys' fees and costs are properly awarded here. In denying the plaintiff's request for attorneys' fees, the Hawai'i Supreme Court focused on the fact that the trial court's order declared that the insured was entitled to "coverage," and made no mention of the payment of "benefits":

> The fact that the court and the participants in this case appear to have given due consideration to the language in the order that entitles Mikelson to coverage rather than benefits, suggests an intent by the court to refrain from ordering that benefits be paid to Mikelson, as such payment issue will be decided via arbitration. Under the circumstances, Mikelson's request for attorney's fees is denied.

*Id.* at 361, 120 P.3d at 260.

Here, to the contrary, the Final Judgment specifically provides that "Plaintiff FIRST INSURANCE COMPANY OF HAWAII, LTD. has an obligation to pay wage loss benefits to Defendant ANGEL DAYOAN, SR. under the terms of the applicable Personal Auto Policy in the amount of $1500 per month which shall terminate upon the death of Plaintiff ANGEL DAYOAN, SR.[.]" Accordingly, Section 242 is applicable, and Dayoan is entitled to reasonable attorneys' fees and costs. *See Commerce & Indus. Ins. Co. v. Bank of Hawaii,* 73 Haw. 322, 329, 832 P.2d 733, 737 (1992) (insurer properly ordered to pay attorneys' fees and costs under Section 242 after contesting liability via declaratory relief action and being ordered to continue paying defense costs); *cf. Ranger Ins. Co. v. Hinshaw,* 103 Hawai'i 26, 34, 79 P.3d 119, 127 (2003) (insurer's declaratory relief action amounted to contesting liability under the policy; because case was voluntarily dismissed, however, insurer was not ordered to pay benefits thereunder, and therefore was not responsible for attorneys' fees under Section 242).

▇ First further contends that reasonable fees, under the circumstances, should not be calculated at $250 per hour, but at $125 per hour, as the administrative hearings officer concluded, and the Commissioner confirmed in his July 11, 2005 final order in *Ruhland v. AIG Hawaii Inc. Co.,* Case Nos. ATX–2005–40–P, ATX2005–41–P, and ATX–2005–59–P. The Commissioner's decision does not preclude the Circuit Court from determining that $250 per hour is a more appropriate rate under different circumstances. Indeed, the administrative hearings officer concluded that the claimant in that case presented no evidence to establish that the hourly rate charged by the claimant's counsel was in line with the prevailing hourly rate charged by other practitioners in this area of the law.

▇ Section 242 specifically states that the court "s hall" award "reasonable attorney's fees and costs." To determine the reasonableness of attorneys' fees, we examine a variety of factors:

> (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients; (3) the customary charges of the Bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an established and constant client. No one of these considerations in itself is controlling. They are mere guides in ascertaining the real value of the service.

*Sharp v. Hui Wahine, Inc.,* 49 Haw. 241, 244–45, 413 P.2d 242, 245–46 (1966) (quotation marks and citation omitted). These factors, however, are "mere guides in ascertaining the real value of the service," and the court is not required to consider each of them in every case. *Booker v. Midpac Lum-*

*ber Co.*, 65 Haw. 166, 173, 649 P.2d 376, 381 (1982) (internal quotation marks and citation omitted).

The record shows that Dayoan's attorneys had each practiced law in Hawai'i for almost twenty years. In addition, Section 302 had only recently been amended, and there were no published cases to serve as precedent. Moreover, Dayoan's attorneys submitted a list of Hawai'i law firms and their hourly charges for partners showing that partners in Hawai'i law firms charged between $150 and $230 on the low end, and between $250–$475 on the high end.

■ Finally, although the amount in controversy cannot be determined with certainty, and although First does not contend that the *amount* of the awarded fees is unreasonable except to the extent that the total amount is calculated based on an attorneys' hourly rate of $250, First has been paying Dayoan $18,000 per year, or $162,000 over nine years. Attorneys' fees of $10,450 is not unreasonable in light of the amount in controversy or the benefits of the services provided.

The award and amount of attorneys' fees rests within the sound discretion of the Circuit Court. Nothing in the record establishes that the court has "clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice." *Chun*, 106 Hawai'i at 431, 106 P.3d at 354. Thus, we conclude that the Circuit Court did not abuse its discretion in awarding attorneys' fees of $10,450 that incorporate a rate of $250 per hour to Dayoan's attorneys.

## IV. CONCLUSION

Ultimately, First is obliged to provide the contracted for benefit because it offered the coverage, established the price at which it was offered, accepted Dayoan's premiums associated with the coverage, and assured him that he would receive the benefit until he died.

The Circuit Court did not err in granting summary judgment or in awarding attorneys' fees and costs to Dayoan. Accordingly, we affirm the November 1, 2006 Final Judgment that was entered in the Circuit Court of the Third Circuit.